IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>WALTER PALMA,<br><br>    Defendant.<br>_____/ | No. CR 08-00565 WHA<br><br>**ORDER RE DEFENDANT'S MOTIONS TO SUPPRESS** |

## INTRODUCTION

In this federal prosecution involving an alleged alien in possession of a firearm, Defendant Walter Palma moves to suppress inculpatory statements he made in November 2005 on Fifth and Sixth Amendment grounds. Defendant also moves to suppress physical evidence obtained in an August 2008 search of his home on Fourth Amendment grounds. For the reasons stated below, defendant's motions to suppress are **DENIED**. Finally, defendant moves to dismiss the first count of the indictment. The government does not oppose the motion. Defendant's motion to dismiss the first count is therefore **GRANTED**.

## STATEMENT

Defendant Walter Palma is charged in a federal indictment with two counts of being an alien in possession of a firearm in violation of 18 U.S.C. 922(g)(5). The first count is based on an incident that occurred in November 2005. The second count is based on an incident that occurred in August 2008. Defendant moves to dismiss the first count of the indictment. The government does not oppose this motion. The first count, therefore, is dismissed. Defendant

also moves to suppress (1) inculpatory statements he made to police in November 2005, and (2) physical evidence obtained by federal agents in August 2008. Except as specifically indicated, the parties do not contest the following facts.

**1.   THE NOVEMBER 2005 ARREST AND INCULPATORY STATEMENTS.**

On November 2, 2005, three officers of the San Francisco Police Department stopped a vehicle driven by Jose Ramirez because Ramirez was not wearing a seatbelt. Defendant Palma, allegedly, was a passenger in the vehicle. As officers approached the car, the officers noticed the barrel of a gun pointing toward them through the sunroof of the car. The officers shouted warnings to each other and took cover.

A passenger ran from the front passenger door of the vehicle. The officers subsequently established control over the vehicle and arrested Ramirez, the sole remaining occupant. The officers then conducted a protective sweep of the car and recovered a loaded 9mm Smith & Wesson semi-automatic handgun lodged in the sunroof. Meanwhile, other officers who had arrived at the scene searched the area and found Palma hiding in a trash bin at a nearby playground. One of the officers involved in the initial traffic stop subsequently identified Palma as the individual who had ran from the passenger side of the car. Palma was arrested for, *inter alia*, carrying a concealed weapon and assault with a semi-automatic firearm.

Palma was taken to the Taraval Police Station, where he invoked his right to remain silent. The following day, November 3, the case was presented to the San Francisco District Attorney's Office. The DA's office, the government asserts, declined to take the case, and the charges against Palma were "dismissed" or "discharged." Palma was transferred to federal immigration authorities. Immigration agents took his fingerprints and information, held him for one day and, on November 4, released him.

On November 4, 2005, following his release, Palma called Sergeant Michael Brown of the San Francisco Police Department's Gang Task Force. Palma asked Sergeant Brown for the release of his cellular telephone, which police had seized at the time of Palma's arrest. Sergeant Brown arranged a meeting with Palma that day and, accompanied by (then) officer Mario Molina, who spoke Spanish, met with Palma at a designated public intersection. The officers

2

secretly recorded the conversation. In the course of the conversation, the officers asked Palma about the gun they had recovered from Rodriguez's car, and Palma made certain incriminating statements tending to indicate that he was in fact the owner of the gun (Pena Exh. A; italicized portions are translated from Spanish):

| | | |
|---|---|---|
| Agent #2: | What happened to your gun, man? | |
| Palma: | *They took it, they didn't want to give it to me.* | |
| Agent #1: | Why? | |
| Agent #2: | [Laughs] You think that are going to give it back man? | |
| Agent #1: | *But why, why would we give it back?* | |
| Palma: | I don't know. They have to. | |

* * *

| | |
|---|---|
| Agent #1: | *You have to be careful with a gun, you can't be on the streets with it. Uhm, what were you waiting for [UI] from the police?* |
| Palma: | My gun. |

* * *

| | |
|---|---|
| Agent #1: | *Why would you want to carry it on the streets? Why?* |
| Palma: | *If somebody wants to kill me. The other day, look over there they started shooting at me.* |

The police re-arrested Palma on or about December 10, 2005, for carrying a concealed weapon and for obstructing law enforcement officers, and the District Attorney's office filed formal charges against him. Those charges remained pending at the time of his August 2008 federal arrest. The November 2005 incident is no longer advanced as a federal count but its evidentiary use remains in play and is a subject of this motion.

**2.  THE AUGUST 2008 FEDERAL ARREST AND THE PHYSICAL EVIDENCE.**

Palma was arrested in August 2008 by Immigration and Customs Enforcement agents after a search of Palma's home uncovered two handguns. That search and arrest arose from the agents' investigation of an individual named Jonathan Cruz-Ramirez.

3

In July 2008, agents obtained an arrest warrant for Cruz-Ramirez for being an illegal re-entrant into the United States and a warrant to search his residence for evidence of illegal re-entry, such as fraudulent identifications, immigration documents and birth certificates. Among other evidence relevant to the arrest, the search uncovered a firearm. The agents then obtained a new warrant to search the residence for items relating to Cruz-Ramirez's gang membership. In the course of the search, Cruz-Ramirez's mother informed agents that Cruz-Ramirez kept much of his property at his girlfriend's home. The agents therefore obtained a warrant to search the girlfriend's home. Through that search, officers found a cellular telephone with names of known or suspected gang members in its memory. Cruz-Ramirez was arrested.

Agents subsequently obtained copies of calls Cruz-Ramirez made from prison after his arrest. Preliminary translations of the Spanish-language conversations indicate that Cruz-Ramirez had called his girlfriend and told her immediately to get rid of the "thing" he had left in her house; to give the "thing" to his friend "Kapone;" and to ask Kapone for $200 for the "thing." Officer Molina (who by then had been promoted to inspector) had known Palma for years and knew that Palma used the nickname "Kapone." Palma had in the past indicated to Molina that he was a member of the same gang as Cruz-Ramirez (Br. Exh. A).

Based predominantly on this information, Magistrate Judge Bernard Zimmerman issued a federal warrant to search Palma's San Francisco residence for evidence of illegal re-entry, racketeering conspiracy, and alien in possession of a firearm. The agents also obtained a warrant for Palma's arrest for being an alien in possession of a firearm in violation of 18 U.S.C. 922(g)(5). Probable cause for the arrest was based on Palma's inculpatory statements made in the course of the above-described state arrest in November 2005.

Agents executed the search warrant on August 11, 2008. The agents found Palma near a sliding glass door that opened onto a deck. They saw Palma holding a firearm; Palma then stepped halfway onto the deck; the agents then heard a thud and saw Palma step back into the room without the handgun (Leung Exh. A). The officers secured Palma. They found one loaded .45-caliber handgun in a trash bin on the deck and another on the deck itself.

4

1    Palma was indicted by a grand jury for two counts of being an alien in possession of a
2 firearm, in violation of 18 U.S.C. 922(g)(5). Count one was based on the November 2005
3 incident and count two was based on the August 2008 incident. As stated, the government does
4 not oppose dismissal of count one. Palma moves to suppress the inculpatory statements he
5 made in November 2005 and the two handguns uncovered in the August 2008 search.

**ANALYSIS**

**1.    MOTION TO SUPPRESS THE NOVEMBER 4, 2005, STATEMENTS.**

Use of the November 2005 statements is challenged on Fifth Amendment and Sixth Amendment grounds.

**A.    Fifth Amendment.**

*Miranda v. Arizona* "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). *Miranda's* protections apply only when a suspect is subjected to interrogation *while in custody*. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). The Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 107 (quoting *Miranda*). The inquiry as to whether a suspect is "in custody" is an objective one: "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112.

*Edwards v. Arizona* further refined *Miranda's* protections, finding it "inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). The Court explained that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id*. at 484.

5

Defendant made the inculpatory statements after he was arrested, invoked his right to counsel and was subsequently released from police custody. After his release, *defendant* re-initiated contact with police officers when, shortly after his release from custody, he called Sergeant Brown to seek the return of his cell phone. A meeting was arranged on a public street. At the meeting, the *officers* first broached the subject of the gun — after some preliminary banter, one of the agents asked "[w]hat happened with your gun man?" Defendant then made the inculpatory statements (Pena Exh. A).

Defendant contends that suppression of the inculpatory statements is warranted because he had invoked his right to counsel when detained and — following his release — police subsequently questioned him about the gun. Defendant does not contend that he was in custody when he made the inculpatory statements to police. Rather, he argues that "the taped interview was close in time to his custodial invocation of his rights." He argues that although he was not in custody, the "'coercive pressures of custody' were still in play." Defendant claims that the *Edwards* rule against re-initiating interrogation after a suspect has invoked his *Miranda* rights should apply in such circumstances (Br. at 4).

This order finds no support for the proposition that non-custodial police interrogations violate *Miranda* merely because they are close-in-time to a period when the suspect had been in custody. Defendant cites *Minnick*, but there the suspect *was* in custody. The decision held that once a suspect had invoked his *Miranda* rights, police may not re-initiate interrogation without the presence of counsel once the suspect had been permitted to confer with counsel. *Minnick*, 498 U.S. at 151–53. The compulsion inherent in custodial interrogations, the decision explained, does not dissipate merely because the suspect has consulted with an attorney. The decision did not address *non-custodial* interrogations or interrogations following a break in custody.

Federal courts have on occasion addressed situations where a suspect had been detained, had invoked his or her *Miranda* rights and police had subsequently re-initiated interrogation following a break in custody. No decision finding a violation in such a situation has been found. *See United States v. Coleman*, 208 F.3d 786, 789–90 (9th Cir. 2000) ("Because

6

1  Defendant had been released from custody for a significant period of time before investigators
2  questioned him again, the district court's refusal to suppress those statements did not violate
3  *Edwards*"); *United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) ("the *Edwards* rule does
4  not apply to suspects who are not in continuous custody between the time they request counsel
5  and the time they are reinterrogated").  It is true, as defendant emphasizes, that decisions
6  *declining* to find violations in such situations have emphasized that there had been a
7  "significant" break in custody prior to interrogation — breaks of two days or more.  *See, e.g.*,
8  *Coleman*, 208 F.3d at 789–90.  This order, however, does not read the courts' use of the word
9  "significant" as requiring a temporal test for non-custodial interrogations following a custodial
10 situation.  Indeed, the Supreme Court has indicated that the *Edwards* rule assumes no break in
11 custody.  *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).  This order declines to extend
12 *Edwards* to non-custodial situations.

13 This order is sympathetic to the possibility that police could devise methods to
14 circumvent or undermine *Miranda's* protections by releasing a suspect temporarily and re-
15 initiating interrogation soon thereafter to obtain an inculpatory response.  There may be
16 occasional circumstances where police could be deemed to have elicited an involuntary or
17 compelled statement through such tactics.  Indeed, it is not inconceivable that the officers in this
18 case held onto the cellular telephone in order to induce Palma voluntarily to return to get it.
19 The dispositive fact remains, however, that Palma voluntarily re-initiated contact with police;
20 Palma was not in custody during the conversation with police; and the circumstances of the
21 encounter bore no indicia of compulsion.

22        **B.      Sixth Amendment.**

23 Defendant also seeks to suppress his November 2005 statements regarding the gun on
24 Sixth Amendment grounds.  The Sixth Amendment provides that "[i]n all criminal prosecutions,
25 the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  The
26 Supreme Court has held that "[t]he Sixth Amendment right [to counsel] . . . is offense specific.
27 It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is
28 commenced."  *Texas v. Cobb*, 532 U.S. 162, 167–68 (2001) (citation omitted).  The Court has

7

1  "pegged commencement to 'the initiation of adversary judicial criminal proceedings — whether
2  by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"
3  *Rothgery v. Gillespie County*, 128 S.Ct. 2578, 2583 (2008).

4  The Supreme Court has further explained that "when the Sixth Amendment right to
5  counsel attaches, it [] encompass[es] offenses that, even if not formally charged, would be
6  considered the same offense under the *Blockburger* test [for 'offense']." *Cobb*, 532 U.S. at 173.
7  That is, "the test to be applied to determine whether there are two offenses or only one[] is
8  whether each provision requires proof of a fact which the other does not." *Ibid*. (citation
9  omitted).

10  The government claims that when Palma made the November 2005 statements he was
11  not in formal adversarial proceedings and his Sixth Amendment rights had not attached,
12  because "following Palma's arrest on November, 2, 2005, his case was dismissed and he was
13  released prior to the filing of any formal charges against him" (Opp. at 13). Defendant, in
14  contrast, asserts his Sixth Amendment rights were violated because he invoked his right to
15  counsel and police subsequently re-initiated questioning without his lawyer present. At the
16  hearing, defendant agreed that the state case against him had been "discharged" for further
17  investigation prior to the inculpatory statements but claimed that he was still under the "threat
18  of charges" and therefore was still in adversarial proceedings.[1]

19  On the record before it, this order is unable to conclude that "prosecution" or "adversary
20  judicial criminal proceedings" against defendant had been commenced at the time defendant
21  made the inculpatory statements. Defendant's San Francisco Police Department Criminal
22  History Record indicates that, as of November 2, the charges were marked with a status entitled
23  "DA DISCH — FURTHER INVESTIGATION NECESSARY" (Reply Exh. A at 1). Certainly
24  there had been no "preliminary hearing, indictment, information, or arraignment." As stated, at

---

[1] In his briefing defendant requested an evidentiary hearing to determine the status of the state case at the time defendant made the inculpatory statements, arguing that "it [was] not clear from the record whether formal charges were pending against Mr. Palma at the time the statements were elicited from him" (Br. at 6). At the hearing, however, both sides agreed that no factual dispute on the issue existed and that an evidentiary hearing was not necessary. Defendant had also moved for production of a translated transcript of the recording of the conversation. At the hearing, both sides agreed to proceed with the quotations from the conversation provided by defendant.

8

the hearing Defendant argued not that Palma faced "formal charges" but rather merely the "threat" of such charges. Defendant offered no distinction between the charges having been "discharged" versus "dismissed" and identified no authority suggesting that charges "discharged" for further investigation qualified as the initiation of formal charges. The Sixth Amendment does not attach with the "threat" of charges but rather with the commencement of *prosecution* — the initiation of adversary *judicial* criminal proceedings. Defendant's motion to dismiss the November 2005 statements, therefore, must be dismissed.

### 2. MOTION TO SUPPRESS PHYSICAL EVIDENCE.

Defendant moves to suppress the guns recovered from the August 2008 search of his house on Fourth Amendment grounds. The Fourth Amendment "prohibits 'unreasonable searches and seizures,' and its Warrants Clause [] requires that 'no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.'" *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (quoting U.S. Const. amend. IV). "[P]robable cause means a 'fair probability' that contraband or evidence is located in a particular place." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213 (1983)). "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a 'commonsense, practical question' . . . . Neither certainty nor a preponderance of the evidence is required." *Ibid*. (citations omitted). Moreover, "[p]robable cause to justify a search warrant exists when there is a sufficient showing that incriminating items are located on the property to which entry is sought . . . . There must exist reasonable cause to believe that the things listed as the objects of the search are located in the place to be searched." *United States v. Ramos*, 923 F.2d 1346, 1351 (9th Cir. 1991) (citations omitted).

"Normally, [courts] do not 'flyspeck' the affidavit supporting a search warrant through *de novo* review; rather, the magistrate judge's determination 'should be paid great deference.' In addition, the Supreme Court has reminded reviewing courts that '[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable

9

1  cause, resolution of doubtful or marginal cases in this area should largely be determined by the
2  preference to be accorded to warrants.'" *Id*. at 1050–51 (citations omitted).

3  Defendant contends that the government lacked probable cause to search his home. As
4  stated, the federal agents' affidavit for the warrant relied predominantly on (1) Cruz-Ramirez's
5  prison calls to his girlfriend, in which he instructed her to get rid of the "thing" he had left in
6  her house immediately and to give it to his friend "Kapone" for $200, and (2) on officer
7  Molina's understanding that Palma used the nickname "Kapone" and was a member of the same
8  gang as Cruz-Ramirez (Br. Exh. A). Defendant argues that this evidence amounts to nothing
9  more than the agents' "bare suspicions" that Palma's house may contain some unspecified
10 inculpatory items. Defendant contends that the affidavit indicates no reason to believe that the
11 "thing" referred to in Cruz-Ramirez's call was illegal; that the affidavit sets forth no evidence
12 tying the "thing" to Palma's home; and that the affidavit fails to support the claim that the
13 phone number in the cell phone found in Cruz-Ramirez's girlfriend's home was "used by
14 Walter Palma" or that the phone was even the girlfriend's phone (Br. at 5–7).

15 The government responds that the affidavit describes the items to be seized with
16 particularity — the affidavit states "[b]ased on my experience, training, and investigation of this
17 matter, I believe that the 'thing' . . . was an additional firearm or some other form of
18 contraband, such as additional false identifications" (Br. Exh. A at 3). The government claims
19 that a neutral magistrate could reasonably find from the above-described facts a "fair
20 probability" that such items would be found in Palma's home. Finally, the government argues
21 that even if the agents lacked probable cause, the guns need not be suppressed because the
22 warrant was not facially defective and the affidavit made no intentionally or recklessly
23 misleading statements, and therefore the government deserves the benefit of the "good faith"
24 exception to the exclusionary rule.

25 Under the "good faith" exception, even absent probable cause, evidence will not be
26 suppressed if the "officer's reliance on the magistrate's probable-cause determination and on
27 the technical sufficiency of the warrant he issues [was] objectively reasonable," and the
28

10

magistrate was not misled by statements made with reckless disregard for the truth. *United States v. Leon*, 468 U.S. 897, 922–23 (1984).

Although the affidavit offered no specific evidence tying the "thing" referenced in Cruz-Ramirez's call specifically to Palma's home, and inferences also were required to believe that the "thing" itself was contraband or evidence, the Fourth Amendment permits reasonable inferences:

> A magistrate is permitted to draw reasonable inferences about where evidence is likely to be kept based on the nature of the evidence and the type of offense. He need not determine that the evidence sought is in fact on the premises to be searched . . . or that the evidence is more likely than not to be found where the search takes place . . . . The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

*United States v. Terry*, 911 F.2d 272, 275 (9th Cir. 1990) (citation omitted). Moreover, "when interpreting seemingly innocent conduct, the court issuing the warrant is entitled to rely on the training and experience of police officers." *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995).

Here, local officers and federal agents knew that Palma and Cruz-Ramirez were in the same gang and that both had a history of gun possession. Agents had found in Cruz-Ramirez's home a handgun and false or doctored immigration documents. When arrested, Cruz-Ramirez called his girlfriend and asked her urgently to give an individual known (or at least reasonably believed) to be Palma a "thing" for safekeeping. The agents stated that, based on their experience, training and investigation of this matter, they believed the "thing" to be given to Palma for safekeeping was another gun or false document. On this record, given the "great deference" owed to magistrates, this order declines to suppress the handguns. At a minimum, the warrant was not facially defective and the agents' reliance on the warrant was objectively reasonable. This order, therefore, declines to suppress the guns found in Palma's home.

**CONCLUSION**

For the reasons stated above, defendant's motions to suppress the November 2005 statements and the evidence obtained from the August 2008 search are **DENIED**. Defendant's motions to dismiss count one of the indictment is **GRANTED**.

**IT IS SO ORDERED.**

Dated: December 19, 2008

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE